UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

IN RE:                                                      Case No.: 24-11047-PDR

NIR MEIR,                                                  Chapter 7

      Debtor.

_____/

YH LEX ESTATES LLC,

      Plaintiff,                                           Adv. No. Pro.: 26-01001- PDR

vs.

NIR MEIR,

      Defendant.

_____/

**PLAINTIFF/CREDITOR YH LEX ESTATES LLC'S OPPOSITION TO
DEFENDANT/DEBTOR NIR MEIR'S MOTION TO DISMISS COMPLAINT**

YH Lex Estates LLC ("YH" or the "Plaintiff"), a creditor of the estate of Nir Meir, the above-captioned debtor (the "Debtor", the "Defendant" or "Meir"), and plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding") by and through its undersigned general counsel, submits its opposition (the "Opposition")[1] to *Defendant's Pro Se Combined Motion to Dismiss And, In the Alternative, For More Definite Statement*, filed on April 23, 2026 [Adv. Pro. No. 14] (the "Motion to Dismiss"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

The Court should deny Meir's Motion to Dismiss the Complaint.  Not only is the Defendant's Motion to Dismiss threadbare and lacking legal support sufficient to dismiss the Complaint, but Meir is

---

[1] Any capitalized terms not specifically defined herein shall have the meanings ascribed to them in the *Complaint Seeking Entry of a Judgment Declaring the Debtor's Obligation to YH Lex Estates LLC to be Nondischargeable Pursuant to 11 U.S.C. § 523(A)* filed by YH on January 5, 2026 [Bkr. Dkt. No. 246; Adv. Pro. Dkt. No. 1] (the Complaint"), commencing the Adversary Proceeding.

35985739-1

precisely the kind of debtor, and his actions the type of conduct, whose debts arising therefrom should not be excused by filing a bankruptcy petition.  Since YH's introduction to Meir, when he was the managing partner of HFZ Capital Group, LLC ("HFZ"), Meir has orchestrated schemes to enrich himself through misrepresentation, theft and deception, through which he diverted millions of dollars away from HFZ into his own pockets.  Indeed, in February 2024, mere days after the Debtor filed his bankruptcy petition before this Court, the Manhattan District Attorney Alvin L. Bragg, Jr. announced the indictment of HFZ and Meir for stealing more than $86 million through a series of frauds and schemes and were charged with varying counts of larceny, conspiracy, falsifying business records, tax fraud, and money laundering.[2]  YH is the victim of Meir's misdeeds.

Meir pleaded not guilty to the criminal charges against him and is awaiting trial, but since 2020, Meir, HFZ and HFZ's founder, Ziel Feldman ("Feldman") have faced scores of investor lawsuits in the New York Supreme Court.  While the victims of Meir's intentional frauds are many, resulting in hundreds of millions of dollars of damages to investors, as evidenced in his bankruptcy case, YH is prevalent among those victims.  YH was harmed in an amount no less than $19,742,959.81, the amount of the Meir Judgment (later defined), along with all interest and fees which continue to accrue on the Meir Judgment.  YH's judgment enforcement efforts have been extensive and costly.  Meir, in connection with his then-wife, Ranee Bartolacci ("Bartolacci"), by and through themselves personally and several businesses owned and controlled by Meir and/or Bartolacci engaged in a brazen fraudulent conveyance scheme and squandered money Meir legally owed to YH on his lavish lifestyle and for his own personal benefit before it all came crashing down on him when he filed this instant bankruptcy

---

[2] "These indictments depict allegations of widespread fraud within the real estate industry primarily spearheaded by one man: Nir Meir," said District Attorney Bragg.  "In total, we allege these defendants' conspiracies netted them a total of $86 million stolen from investors, contractors, and the City of New York.  My Office's Rackets Bureau is laser-focused on fraud in the construction and real estate industries and will continue to root out people who steal from investors and corrupt the market."  *See* Complaint at ¶ 8.

petition and, soon thereafter, was arrested, extradited from Florida to New York where he was held in custody at Rikers Island.

Meir's numerous and extensive false representations to YH, in furtherance of his broader fraud scheme, started when Meir obtained the HFZ Loans (later defined) from YH, misrepresenting HFZ's business purposes, his own position and ownership interests in HFZ. His lies to YH continued when, in 2019 and 2020, YH sought a personal guaranty from Meir because HFZ failed to repay the HFZ Loans. At the time of the Meir Guaranty to YH (later defined), Meir represented to YH that he was the direct owner of real estate in Southampton, New York that would secure the Meir Guaranty to YH. In reality, the real estate was owned by and through several limited liability companies with shifting membership interests, which Meir concealed from YH. Notably, Meir also fabricated sham limited liability company operating agreements related to the Hamptons property that further frustrated, confused and concealed the true ownership of the property. He later used the Sham EZL Operating Agreement (later defined) regarding the ownership of 40 Meadow Lane (later defined) to carry out a fraudulent conveyance scheme Meir orchestrated through Bartolacci and *from which Meir directly benefitted*. Meir directed the fraudulent transfers of the sale proceeds of 40 Meadow Lane away from YH and other creditors, causing significant harm to YH while Meir used those funds to continue to enjoy the extravagant lifestyle detailed in the Complaint, and even received no less than $3.7 million in direct transfers back from his own scheme.

From the time YH advanced the funds for the HFZ Loans, through the Meir Guaranty to YH and through Meir's fraudulent transfer scheme that traversed several states and numerous courts, YH detrimentally relied on Meir's false representations, which caused significant damage to YH. The Complaint details, with particularity, a plethora of bad acts perpetrated by Meir that were specifically directed at YH, and which have significantly harmed YH for more than six years. Not only should the

35985739-1

Plaintiff's Complaint not be dismissed, but Meir should not be discharged or excused from paying YH the balance of its uncollected debt on the Meir Judgment, which is to be determined at trial.

## BACKGROUND

1. Between May 15, 2017 and May 3, 2019, YH loaned monies to HFZ, pursuant to a multi-tranche convertible loan reflected in a series of promissory notes, (*i.e.*, the HFZ Loans) with respect to a potential mixed residential/commercial development project on the Upper East Side of Manhattan.

2. After HFZ failed to repay the HFZ Loans to YH as they matured, Meir and Feldman each provided personal guaranties to YH in November 2019 and each provided a restated personal guaranty to YH in July 2020 (the "Meir Guaranty to YH").

3. At the time the Debtor executed the Meir Guaranty to YH in July 2020, the Debtor misrepresented to YH that his principal personal asset was real property located at 40 Meadow Lane, Southampton, New York ("40 Meadow Lane").

4. When HFZ was unable to repay the HFZ Loans, according to the parties' amended agreement, YH sent a series of default notices to the Debtor, dated August 12, 2020, August 24, 2020, September 1, 2020, October 18, 2020, and October 30, 2020, advising him of his absolute, unconditional liability under the Meir Guaranty to YH and notifying him that YH would be filing a lawsuit against him imminently. Notwithstanding the numerous default notices to HFZ and the Debtor, as personal guarantor, no further payments were made to YH.

5. On November 3, 2020, YH commenced an action, captioned *YH Lex Estates LLC v. HFZ Capital Group LLC, Ziel Feldman and Nir Meir*, Index No. 655980/2020 (Sup. Ct. N.Y. Cty., filed Nov. 3, 2020) (the "YH-Meir Action"). On June 15, 2021, the Supreme Court of the State of New York, New York County (the "NY State Court") entered a judgment against Meir in

35985739-1

favor of YH in the YH-Meir Action, in the principal amount of $19,742,959.81 (the "Meir Judgment"). The Meir Judgment has continued to accrue interest and fees since its date of entry.

6.       Prior to and following entry and recording by YH of the Meir Judgment, the Debtor undertook a series of calculated efforts in connection with a larger fraudulent transfer scheme, to transfer his assets, or the value thereof, out of the reach of the Meir Judgment and YH generally.

7.       Specifically, on April 5, 2021, shortly before the NY State Court entered the Meir Judgment but *after* the Court had reached its decision with respect to the Meir Judgment, Meir orchestrated the transfer of title of certain real property located at 40 Meadow Lane, Southhampton, New York (the "40 Meadow Lane" or the "Property"), which was held by EAM 40 Meadow Lane LLC ("EAM"), to an unrelated third party for approximately $43 million.

8.       The Debtor orchestrated the sale of 40 Meadow Lane on April 5, 2021 in direct contravention of YH's specific request to Meir's attorneys on March 24, 2021, leading up to the hearing on summary judgment before the NY State Court in the YH-Meir Action that Meir, "has not, and will not during the pendency of our case against him, assign, dispose of, encumber, or otherwise transfer his direct or indirect interest(s) in the 40 Meadow Lane property." Neither Meir nor his attorneys responded to YH's request and proceeded to take steps in execution of what the Complaint describes as the Meir-Bartolacci Fraud Scheme (*e.g.,* form Ermitage One LLC, ('Ermitage"), a New York entity in Bartolacci's name, to receive the sale proceeds from 40 Meadow Lane to which it had no legal interest or entitlement).

9.       On March 31, 2021, the NY State Court held a hearing on YH's request for a temporary restraining order and order of attachment (the "TRO Proceeding") with respect to the sale of 40 Meadow Lane, at which, the Debtor, through his counsel, made representations and assurances to the NY State Court that the net sale proceeds would remain available to satisfy any judgment to YH.

5

35985739-1

10.     Despite the warnings of the Court and HFZ's counsel to the Debtor about its intentions for the sale of 40 Meadow Lane during the pendency of YH's attachment motion, and the Debtor's purported assurances to the NY State Court that sale proceeds would remain available to satisfy YH's impending judgment against Meir, the Debtor, with the help of Bartolacci and the newly created Ermitage, closed on the sale of 40 Meadow Lane on April 5, 2021, for $44,009,900.

11.     With the imminent entry of the Meir Judgment, Meir then directed the title company to transfer nearly all of the sale proceeds from 40 Meadow Lane to various third parties, leaving nothing for EAM or its holding company, EZL 40 Meadow Lane LLC ("EZL"), the owners of 40 Meadow Lane that should have received the net proceeds from the sale once the secured creditors were satisfied.  Importantly, Meir caused approximately $12.6 million to be transferred to Bartolacci and Ermitage, which not only continued to fund Meir and Bartolacci's excessive lifestyle, but Meir also received approximately $3.7 million of that cash back from Ermitage.

12.     On February 1, 2024 (the "Petition Date"), Meir filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

13.     On February 1, 2024, Drew M. Dilworth (the "Trustee") was appointed interim chapter 7 trustee of the Debtor's estates.

14.     In February 2024, merely days after the Petition date, Meir was arrested and taken into custody in Miami, Florida and subsequently extradited to New York City.  Between February 6, 2024 and March 2025, Meir was incarcerated at Rikers Island.  Due to his incarceration, the Debtor's meeting of creditors under 11 U.S.C. § 341(a) was adjourned for many months before the Debtor was permitted to appear virtually.

15.     On April 26, 2024, YH filed a proof of claim against the Debtor, asserting a secured claim based on a recorded judgment, in an amount no less than $19,742,959.81, for which interest and fees continue to accrue (See Claim No. 3) (the "YH Claim").

16.     On November 6, 2024, while the Debtor was incarcerated at Rikers Island, the Trustee presided over the first meeting of creditors in the Debtor's case and became the permanent trustee herein by operation of section 702(d) of the Bankruptcy Code.

17.     From time to time, the Debtor and YH have agreed to extend YH's deadline to file the instant Complaint, or otherwise to object to the Debtor's claim exemptions. [*See* Dkt. Nos. 92, 100, 101, 137, 151, 163, 196, 213, 217 and 222].

18.     On January 5, 2026, YH filed the Complaint against Meir pursuant to 11 U.S.C. § 523(a)(2), (4) and (6), among other relief.

## ARGUMENT

### I.     LEGAL STANDARD FOR MOTION TO DISMISS

#### A.  Federal Rule of Civil Procedure 12(b)(6)

19.     When deciding a motion under Rule 12(b)(6) of the Federal Rules, made applicable hereto by Rule 7012 of the Bankruptcy Rules, the Court must treat all well-pleaded facts as true and interpret all facts in the light most favorable to the plaintiff. *See Ortiz v. Deutsche Bank AG (In re Estrategias en Valores, S.A.*), 628 B.R. 722, 726 n.1 (Bankr. S.D. Fla. 2021) (*citing Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility does not require probability, but it does require something "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 556).

35985739-1

20. "'[T]o survive a motion to dismiss, a complaint must now contain factual allegations that are 'enough to raise a right to relief above the speculative level.'" *CLM Trust LLC v. Pavel*, 2026 Bankr. LEXIS 811 at *7 (Bankr. N.D. Ga., Newnan Division, Mar. 31, 2026), citing Fed. R. Civ. P. 12(b)(6), viewed through Fed. R. Civ. P. 8(a), incorporated to this Adversary Proceeding through Fed. R. Bankr. P. 7008(a). In addition, under Fed. R. Civ. P., incorporated herein under Fed. R. Bankr. P. 7009, "fraud must be plead with particularity and, although malice and intent may be alleged generally, facts regarding time, place, and content of any alleged misrepresentations must be provided." *CLM Trust*, 2026 Bankr. LEXIS 811 at *7.

## II. COUNTS I, II, AND III OF PLAINTIFF'S COMPLAINT SHOULD NOT BE DISMISSED

### A. Plaintiff Sufficiently Pleaded Count I (11 U.S.C. § 523(a)(2)) with Particularity

21. YH's Complaint is replete with specific allegations about Meir and his fraudulent actions that satisfy the pleading standards of a claim under Section 523(a)(2)(A). Specifically, the Complaint contains approximately 130 paragraphs of facts set forth over 24 pages detailing false and fraudulent representations Meir made to YH and the resulting damages to YH, all of which support YH's pleadings to except the YH Claim from discharge in the Debtor's bankruptcy case.

22. Section 523(a)(2)(A) of the Bankruptcy Code excepts certain debts from discharge if the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. *See* 11 U.S.C. § 523(a)(2)(A). For a creditor to except a debt under section 523(a)(2)(A) of the Bankruptcy Code, the creditor must show that the debtor, "obtained money, property, or credit from the plaintiff: (1) by false representation, pretense or fraud; (2) knowingly made or committed; (3) with the intent to decide or to induce acting on same; (4) upon which the Plaintiff actually and justifiably relied; and (5) from which the Plaintiff suffered damages, injury or loss as a proximate result.. *CLM Trust*, 2026 Bankr. LEXIS 811 at *9 (citing

8

*Invest Atlanta Reg'l Center, LLC v. Smith (In re Smith)*, 578 B.R. 866, 876 (Bankr. N.D. Ga. 2017) (citations omitted).  "Actual fraud precluding discharge 'consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design or perpetrating what is known to be a cheat or deception.'"  *Conseco v. Howard (In re Howard)*, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) and 4 Collier on Bankruptcy P 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King, 2000).  In the present case, the (irrefutable) allegations of Meir's conduct present a textbook example of grounds for an exception under Section 523(a)(2)(A).

23.     By contrast, Meir alleges, without support, that Plaintiff's Count I fails to satisfy a viable claim under Section 523(a)(2)(A) because the Complaint "fails to allege with particularity: the specific statements made; when and where they were made; how they were false when made; facts demonstrating intent to deceive."  *See Motion to Dismiss* at p. 4.  Additionally, Defendant asserts that the Plaintiff fails to plausibly allege justifiable reliance and that "[g]iven Plaintiff's extensive independent litigation and dealings with multiple sophisticated parties, reliance is not plausible." *id.*

24.     Meir contends that the Complaint is insufficient.  But he completely ignores the extensive factual background set forth in the Complaint.  The Complaint contains numerous allegations concerning Meir's fraudulent acts and his intent to defraud his creditors, including YH.  *See, e.g., Complaint at ¶¶* 12, 15-16, 19-26, 43-44, 55-73, 76, 79.  The Complaint more than sufficiently pleads, and put Meir on notice, about his misrepresentations, inducements and fraudulent conveyance scheme – all of which is beyond cavil.

## 1.   <u>YH Detrimentally Relied on Meir's Numerous False Representations</u>

25.     First, the Complaint makes clear that Meir's initial debt to YH was obtained under false pretenses and misrepresentations made by Meir.

26.     Between May 15, 2017 and May 3, 2019, YH extended the HFZ Loans to HFZ through promissory notes related to a potential mixed residential/commercial development project on the Upper Estate Side of Manhattan. *See* Complaint at ¶ 46. For many years prior to YH making the HFZ Loans, the Debtor held himself out to YH and others as the Managing Principal of HFZ. *id. at* ¶ 43. However, Feldman was the Chairman and founder of HFZ, not Meir. In fact, Meir never held an ownership or membership interest in HFZ. *id. at* ¶¶ 44 - 45.

27.     After HFZ failed to repay the HFZ Loans as they matured, the Debtor provided personal guaranties to YH in November 2019, restated in July 2020 (the "Meir Guaranty to YH"). *id. at* ¶ 47. In making the Meir Guaranty to YH, the Debtor falsely represented to YH that his principal personal asset, upon which YH premised its decision regarding the Meir Guaranty to YH, was the real property at 40 Meadow Lane. *id. at* ¶ 48.

28.     However, the Debtor's representations about his ownership interest in 40 Meadow Lane, upon which the Meir Guaranty to YH was created, was also falsified by the Debtor.

29.     Specifically, in or around 2013, the Debtor entered into a contract to purchase 40 Meadow Lane, which HFZ agreed to purchase for the Debtor as part of his compensation. Before closing the purchase, however, HFZ's attorneys formed EAM, a Delaware limited liability company, to hold title to 40 Meadow Lane. Under EAM's original limited liability company agreement, dated as of June 2013, HFZ was the sole member. *id. at* ¶¶ 56 - 58.

30.     On December 30, 2013, however, HFZ then transferred 50% of its ownership interest in EAM to the Debtor as compensation. That same day, EAM amended its limited liability company agreement in a document titled, "Second Amended and Restated Limited Liability Company Agreement", dated as of December 30, 2013, to reflect the fact that it was now owned equally by the Debtor and HFZ. *id. at* ¶¶ 59 - 60.

10

31.     On March 5, 2019, HFZ's attorneys formed EZL under the laws of Delaware on behalf of the Debtor to own and hold membership interests in EAM. Pursuant to the EZL operating agreement dated March 21, 2019 (the "Original EZL Operating Agreement"), the Debtor was the sole member of EZL. On March 21, 2019, Meir transferred his 50% ownership interest in EAM to EZL. Concurrently, HFZ then transferred 45% of its remaining 50% ownership in EAM to EZL as compensation to the Debtor, thus rendering the Debtor the 100% owner of EZL. *id. at* ¶¶ 61 - 64.

32.     That same day, EAM amended its operating agreement to reflect the fact that it was now owned 95% by EZL and 5% by HFZ. Thus, through EZL, the Debtor was the 95% beneficial owner of 40 Meadow Lane and the Managing Member of EAM. Thereafter, HFZ transferred its remaining 5% of EAM directly to the Debtor personally, in his individual name, rendering the Debtor the 100% beneficial owner of all right, title, and interest in and to 40 Meadow Lane. *id. at* ¶¶ 65 - 66.

33.     Meir repeatedly represented to YH and others in court filings, real estate transaction documents, verified statements to tax authorities, sworn settlement and indemnity agreements that he was the sole beneficial owner of 40 Meadow Lane. In making these (mis)representations, Meir relied on the Original EZL Operating Agreement from March 5, 2019. *id. at* ¶ 67.

34.     Meir also (mis)represented himself as the sole beneficial owner of 40 Meadow Lane when he made the Meir Guaranty to YH in November 2019, which concealed the numerous transfers of ownership and interests in 40 Meadow Lane that transpired between 2013 and 2019. *id. at* ¶ 68.

35.     All the while, Meir had created a sham second EZL Oeprating Agreement, *also dated March 21, 2019* (the "Sham EZL Operating Agreement"), which alleged that Bartolacci owned 95% of EZL. Bartolacci personally signed the Sham EZL Operating Agreement. *id. at* ¶¶ 69 - 71.

11

35985739-1

36.    Meir orchestrated this fraudulent scheme so when he sold 40 Meadow Lane, after lying to YH and the NY State Court[3] about the disposition of the Property, he could justify diverting a substantial portion of the 40 Meadow Lane sale proceeds to Bartolacci, in an attempt to avoid the debt to YH. *id.* at ¶ 71.  Both YH and the NY State Court relied on Meir's (mis)representations about the collateral underlying the Meir Guaranty to YH.

37.    Following October 21, 2020, the Debtor relied upon the Original EZL Operating Agreement, holding himself out as the sole or principal beneficial owner of 40 Meadow Lane.  *id.* at ¶¶ 73 - 75.  Thereafter, two courts in Florida and New York determined that Meir, not Bartolacci, was the sole or principal beneficial owner of 40 Meadow Lane, through EAM and EZL. *id.* at ¶¶ 76 - 79.

### 2.    Meir Benefitted from his Own Fraudulent Transfer Scheme

38.    Binding Supreme Court precedent holds that "[a]ctual fraud for purposes of 11 U.S.C. § 523(a)(2)(A) encompasses forms of fraud, including fraudulent conveyance schemes, **that can be accomplished without a false representation by the debtor**." *Husky*, 578 U.S. 355 at 357, 359 (resolving circuit split and holding that actual fraud for purposes of 11 U.S.C. § 523(a)(2)(A) encompasses forms of fraud that can be accomplished without a false representation by the debtor, such as a fraudulent conveyance of property made to evade payment to creditors) (*emphasis added*).[4]

39.    Section 523(a)(2)(A) is broad and was framed by Congress to "focu[s] on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent

---

[3] "Indeed, this Court itself was a victim of Mr. Meir's and his accomplices' fraud when it denied a TRO to YH Lex on the eve of the closing of the sale of the Hampton's property.  This very Court took Mr. Meir and his counsel at their word that a closing was not imminent; that the proceeds would be secured; and that there were other assets available to satisfy any judgment against Mr. Meir.  Every one of those representations turned out to be pathologically false.  The closing was being expedited with plans to transfer the money to an unsuspecting Ms. Bartolacci and no additional assets were available to satisfy a judgment." *See YH-Meir II*, Index No. 151267/2022, Dkt. No. 460 (Brief at 2-3); *id.* at ¶ 15.

[4] The Supreme Court reasoned that it was "sensible to presume that when Congress amended the Bankruptcy Code in 1978 and added to debts obtained by 'false pretenses or false representations' an additional bankruptcy discharge exception for debts obtained by 'actual fraud,' it did not intend the term 'actual fraud' to mean the same thing as the already-existing term 'false representations.'" *Husky*, 578 U.S. 355. At common law, "actual fraud" meant fraud committed with wrongful intent, and since the beginning of the bankruptcy practice, the term "fraud" has been used to describe asset transfers that impair a creditor's ability to collect to a debt.

35985739-1

or culpability." *Bartenwerfer v. Buckley,* 598 U.S. 69, 75-76, 83, 143 S. Ct. 665, 214 L. Ed. 2d 434 (2023) (barring debtors from discharging a debt obtained by fraud of the debtor's agent or partner under Section 523(a)(2)(A)); *citing Dean v. United States*, 556 U.S. 568, 572, 129 S. Ct. 1849, 173 L. Ed. 2d 785 (2009). Congress incorporated the common-law principles of fraud into Section 523(a)(2)(A), and although it required the debt to result from someone's fraud to be non-dischargeable, Congress was 'agnosti[c]' about who committed it." *Id.* at 76; *quoting Watson v. United States*, 552 U.S. 74, 81, 128 S.Ct. 579, 169 L. Ed. 2d 472 (2007).

40.    "[I]n the fraud-discharge exception, context does not single out the wrongdoer as the relevant actor. Quite the opposite: The relevant legal context – the common law of fraud has long maintained that fraud liability is not limited to the wrongdoer." *id.* "[…] Individual debtors can be liable for fraudulent schemes they did not devise." *id.* The common law term "actual fraud" is broad enough to incorporate fraudulent conveyances, which do not require a misrepresentation from a debtor to a creditor, "as they lie not in dishonestly inducing a creditor to extend a debt but in the acts of concealment and hindrance." *Husky*, 578 U.S. at 356.

41.    "[…] [i]nnocent people are sometimes held liable for fraud they did not personally commit, and, if they declare bankruptcy, §523(a)(2)(A) bars discharge of that debt." *Bartenwerfer*, 598 U.S. at 83.

42.    Courts interpreting the Supreme Court's decision in *Husky* have declined to extend the fraud-discharge exception to parties who fraudulently transferred money because their debt pre-existed the fraud and apply Section 523(a)(2) where "someone sends the bankruptcy debtor money to fraudulently avoid his debt." *See PRN Real Est. & Invs., Ltd. v. Cole*, 85 F. 4th 1324, 1342 (11th Cir. 2023). "Section 523(a)(2)(A) thus 'turns on how the money was obtained." *.Id. at 1344 (citing Bartenwerfer*, 598 U.S. at 72. "If the debtor obtained money by actual fraud, then 'any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).'" *PRN*

13

35985739-1

*Real Estate*, 85 F. 4ᵗʰ at 1344 (citing *Husky*, 578 U.S. at 365 (citations omitted)).  Additionally, this Circuit has previously held that "if the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Conseco*, 261 B.R. at 519.

43.     Here, YH has alleged that Meir acted with the requisite wrongful intent in carrying out his fraud schemes, including the Meir-Bartolacci judgment-evasion scheme, along with other direct misrepresentations Meir made to YH in furtherance of his deception, which inured to the Meir's benefit – and YH's detriment.  As alleged in the Complaint, Meir was not only the transferor in these fraud schemes , he was also a transferee who benefitted from this fraudulent activity.

44.     Meir's actions, bad faith and his wrongful intent towards YH are evidenced before, during, and after YH made the HFZ Loans, obtained the Meir Guaranty and ultimately obtained the Meir Judgment.  Meir's wrongful and fraudulent actions are evident in Meir's misdirection of the proceeds of the sale of the 40 Meadow Lane property to parties other than YH or those with a valid and enforceable interest in the Property.  Meir's fraudulent actions and intent continued after the sale of the Property when Meir redirected certain of those proceeds back to himself, including millions of dollars in direct transfers to himself and the use of proceeds that he parked with his former wife to fund his extravagant lifestyle, while actively evading YH's judgment through deceit and deception (including transferring gold bars and wine collections and luxury vehicles, and the use of home security systems to evade process servers) that would almost be incredulous in a second-rate airport novel, except that it actually happened here.

45.     Although *Husky* and *Bartenwerfer* make clear that claims asserted under Section 523(a)(2)(A) survive dismissal even where they do not specifically allege false representations made directly to the creditor, inducing it to extend value, YH's Complaint alleges numerous facts showing Meir's repeated and damaging misrepresentations to YH, which is why Meir's underlying debt to YH

14

remains unpaid today and why the debt increased long after the Meir Judgment was entered. *See* Complaint at ¶¶ 12 15, 16, 19, 20-26, 43, 44, 55, 56-67, 68-73, 76, 79.

46.     Meir disregards the Supreme Court's rulings in *Husky*, and later in *Bartenwerfer*, holding a debt non-dischargeable under Section 523(a)(1)(A), where, as here, the debtor was an integral actor in a fraudulent conveyance scheme (i.e., the Meir-Bartolacci judgment-evasion fraud scheme) who intended to defraud YH, and potentially other creditors, for his own benefit. *See* Complaint at ¶¶ 80-104.

47.     Indeed, under *Bartenwerfer*, even if Meir had committed acts far less egregious than those committed here and alleged in the Complaint, he would still be liable for fraud and his debt to YH would not be dischargeable under Section 523(a)(1)(A).  YH's Complaint makes clear that Meir acted with wrongful intent at every turn in the Meir-Bartolacci judgment-evasion fraud scheme.  *See* Complaint at ¶¶ 80-131.

48.     Although YH, HFZ and others became aware of the Defendant's fraudulent scheme, Meir unconscionably closed the sale of 40 Meadow Lane on April 5, 2021, for $44,009,990, during the pendency of YH's attachment motion. *id.* at ¶ 95.  Meir then took steps, supposedly justified by the Sham EZL Operating Agreement, to conceal and secret away the Debtor's assets (to his former spouse and via various entities) to avoid his Guaranty and the imminent Judgment, which the NY State Court was about to enter against Meir at the time of the 40 Meadow Lane sale. *id.* at ¶ 96.  The Debtor relied on the Sham EZL Operating Agreement to justify his decision to instruct the title company to transfer $10,587,387.52 of the 40 Meadow Lane sale proceeds to Bartolacci and an additional $2,000,000 to Ermitage. *id.* at ¶¶ 96-98.

49.     Meir was not merely the transferor in this judgment-evasion fraud scheme, but he directly benefitted as transferee as well. *id.* at ¶¶ 105-114.

15

35985739-1

50. In addition to the transfer of $2 million to Ermitage, an entity with no interest in or claim against 40 Meadow Lane, at the time of closing, Meir was also the beneficiary of funds transferred to Bartolacci and Ermitage which were used to fund Meir's lavish lifestyle. That lifestyle included a Miami Beach rental property that cost approximately $150,000/month in rent alone, purchases of cryptocurrency, gold bullion, investment grade wine and investment vehicles. *id.* at *¶¶* 115-121.

51. Following receipt of the fraudulently transferred sale proceeds from 40 Meadow Lane, Bartolacci, in relevant part, transferred approximately $5 million to a Chase bank account ending in -0193, in the name of Ermitage, and subsequently transferred approximately $3.75 million to an account in the name of Ermitage at Morgan Stanley. *id.* at *¶* 117. After April 2021, Ermitage specifically transferred at least $3.7 million back to Meir. *id.* Bartolacci claims that she did all of this under the sway and threats from Meir and that Meir controlled the proceeds that he parked in her accounts.

52. As a result, all of the fraudulent transfers, including no less than $3.7 million directly transferred back to Meir's accounts, should be excepted from discharge in connection with the instant proceeding, should not be dismissed, and survive any post-*Husky* decisions rendered by the Eleventh Circuit.

53. For these reasons, Meir's request to dismiss Plaintiff's Section 523(a)(2) claims should be denied.

### B. Plaintiff Pleaded Count II (11 U.S.C. § 523(a)(4)) Sufficient with Particularity

54. Section 523(a)(4) excepts debts for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." "The elements of embezzlement . . . are established by federal common law, rather than state law." *See In re Cockey*, 622 B.R. 178, 188 (Bankr. D. Md. 2020) (citations omitted); *United States v. Patton*, 120 F.2d 73, 75 (3d Cir. 1941) ("It is . . . well settled that when a federal statute uses a term known to the common law to designate a common

16

law offense and does not define that term, courts . . . construe [the term using its] common law meaning.").

55.     Embezzlement requires the plaintiff to prove: "(1) that the funds were rightfully in the possession of the Debtor; (2) that the Debtor appropriated the funds for a use other than that for which it was entrusted; and (3) circumstances indicating fraud." *In re Cockey*, 622 B.R. at 188 (collecting cases); *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998) ("Embezzlement is defined for purposes of § 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.") (citations omitted).

56.     "To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property." *In re Miller*, 156 F.3d at 602-03 (collecting cases); *see also, e.g., Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 117 (B.A.P. 6th Cir. 2007) (noting that embezzlement under § 523(a)(4) requires actual, intentional fraud and citing cases).  Fraudulent intent means intent to defraud, to deceive, or to act in bad faith.  *See In re Kaplan*, 608 B.R. 443, 457 (Bankr. E.D. Pa. 2019); *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274-75, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013) (noting that both embezzlement and larceny require a showing of wrongful intent—such as a showing of moral turpitude, intentional wrong, or felonious intent); *see also Alternity Capital Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 326 (Bankr. D. Colo. 2013) ("Historically, both larceny and embezzlement have consistently had a criminal intent requirement.").

57.     It is not enough to show that the debtor took property belonging to the plaintiff without consent and without lawful justification—i.e., that the debtor converted the plaintiff's property. *See In re Cockey*, 622 B.R. at 189. The plaintiff must show that the debtor had a fraudulent or unlawful intent, directed at the plaintiff, at the time of the claimed

17

misappropriation. *See In re Ghaemi*, 492 B.R. at 326 (noting that embezzlement differs from conversion because embezzlement requires criminal intent, while conversion requires only a specific intent to take the property); *In re Kaplan*, 608 B.R. at 457 (stating that embezzlement requires proof of fraudulent intent directed at the owner, while conversion requires only the simple intent to exercise dominion or control over property that is inconsistent with the owner's rights). Where the debtor's dominant purpose is to benefit herself, rather than to harm the creditor, fraudulent intent is not established. *See In re Fox*, 370 B.R. at 117-18 (finding that because debtor's intent in withdrawing funds was to recoup his capital investment and benefit his own property, rather than to harm the creditor, the debtor did not have the requisite intent). Indeed, one can wrongfully appropriate property under a mistaken belief of entitlement without giving rise to a claim of embezzlement. *See, e.g., Great Am. Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761, 765 (Bankr. E.D.N.C. 1983) ("Even where the facts of a case show some relation of trust requiring a debtor to hold funds for another, the debtor's subsequent appropriation of the funds will not amount to embezzlement absent proof of the debtor's fraudulent intent.").

58.  Here, what appeared to be loan transactions (*i.e.,* the HFZ Loans from YH to HFZ), was actually a scheme conceived and orchestrated by Meir, through HFZ, to embezzle YH's funds for the Debtors' own personal gain.

59.  Scores of lawsuits have been filed against Meir, Feldman and HFZ in the New York courts, in addition to criminal charges against Meir, arising from the Ponzi scheme caried out by Meir (and Feldman). *See* Complaint at ¶¶ 54-55. Those lawsuits revealed that Meir (and Feldman) regularly borrowed money from private lenders, which they then bundled as if the underlying funds belonged to HFZ, to convince commercial lenders of HFZ's financial wherewithal for the purpose of obtaining purchase money mortgages and construction loan financing for HFZ's proposed real estate development projects. *id.* at ¶ 55. Then, Meir (and Feldman – although Feldman claims that Meir alone orchestrated

18

this scheme) would overload their real estate development projects with staggering debts, backed by preposterous amounts of personal financial guaranties (for example, the Debtor personally guaranteed more than $173 million of HFZ's debt); they would then, drain their real estate projects to fund their extravagant lifestyles, including, for example, the Debtor's 40 Meadow Lane property, a $43 million mansion on Southampton's "Billionaire Lane". *id.*

60.    Meir (and Feldman) employed the same approach and carried out the same fraud when it obtained loans from YH, making numerous misrepresentations about HFZ and its business purpose as well as Meir's position and interest in HFZ to YH. *id at ¶¶* 43-47. Between May 15, 2017 and May 3, 2019, YH loaned monies to HFZ, pursuant to a multi-tranche convertible loan reflected in a series of promissory notes, with respect to a potential mixed residential/commercial development project on the Upper East Side of Manhattan (collectively, the "HFZ Loans"), which HFZ inevitable failed to repay as they matured. *id*.

61.    Meir continued to misrepresent himself to YH in 2019 and 2020, when Meir guaranteed the HFZ Loans to YH, showing that he was the direct owner of real estate in Southampton, New York that would secure his guaranty of YH's loans, when, in reality, the real estate was owned by and through several limited liability companies with shifting membership interests, which Meir concealed from YH. *id at ¶¶* 56-79. Notably, Meir also fabricated sham limited liability company operating agreements related to the Hamptons property that further frustrated, confused and concealed the true ownership of the property. *id*.

62.    Ultimately, the concealment related to the ownership of Meir's property at 40 Meadow Lane was intentional to carry out a fraudulent conveyance scheme Meir orchestrated through his then-wife, Ranee Bartolacci, *from which Meir directly benefitted* from the fraudulent transfers of assets away from YH and its interests. *id at ¶¶* 80-104; 115-127; 128-131. From the time YH advanced the funds for the HFZ Loans, through the Meir Guaranty to YH and through Meir's fraudulent transfer scheme

19

that traversed several states and numerous courts, YH detrimentally relied on Meir's false representations, which caused significant damage to YH. *id.* Meir's conduct throughout was unconscionable and fraudulent.

63.     YH has sufficiently pleaded Count II of the Complaint, asserting a claim under 11 U.S.C. § 523(a)(4), which should not be dismissed.

### C.    Plaintiff Pleaded Count III (11 U.S.C. § 523(a)(6)) with Sufficient Particularity

64.     A discharge of a debtor in bankruptcy does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. 11 U.S.C. § 523(a)(6).  "A willful and malicious injury under § 523(a)(6) is confined to acts, such as intentional torts, done with an actual intent to cause injury as opposed to acts done intentionally that result in injury." *CLM Trust*, 2026 Bankr. LEXIS 811 at *16; *see also Cox v. Corona (In re Corona)*, 657 B.R. 554, 567 (Bankr. N.D. Ga. 2024) (citations omitted)

65.     While the "failure to pay debt or a knowing breach of contract, on its own, does not present a claim for willful and malicious injury," Meir's intentionally fraudulent actions to ensure that YH received no money in return for the HFZ Loans or the Meir Guaranty to YH are detailed and clear in YH's Complaint. *Id. (*citing *Natl's City Bank v. Wikel (In re Wikel)*, 229 B.R. 6, 11 (Bankr. N.D. Ohio 1998).

66.     To except a debt from discharge under the willful and malicious discharge exception in § 523(a)(6), a plaintiff must prove by a preponderance of the evidence that a debtor: 1) deliberately and intentionally; 2) injured the plaintiff or the plaintiff's property; by 3) a willful and malicious act." *Conseco*, 261 B.R. at 520; *see also Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163-65 (11th Cir. 1995) (finding that "an injury is willful when a debtor commits an intentional act for the purpose of causing injury or which is substantially certain to cause injury." An act that is merely

20

35985739-1

reckless does not amount to a willful act for the purposes of debt dischargeability." "A malicious act is one which is 'wrongful and without just cause or excessive even when in the absence of personal hatred, spite, or ill-will.'"). Here, Plaintiff has set forth a prima facie case, indeed a textbook example, of malicious, intentional and willful conduct by Meir that was designed to injure Plaintiff. There should be no discharge for such unconscionable conduct by a debtor.

67. Because the word 'willful' in (a)(6) modifies the word 'injury,' the Supreme Court found that nondischargeability required a deliberate act taken with the intention to cause an injury, not merely a deliberate act taken that ultimately but unintentionally leads to injury. *Conseco*, 261 B.R. at 520; *see also In re Tomlinson*, 220 B.R. 134, 137 (Bankr.M.D.Fla.1998) (*citing Kawaauhau v. Geiger*, 523 U.S. 57, 140 L. Ed. 2d. 90, 118 S. Ct. 974, 977 (1998)). The Supreme Court restricted the scope of § 523(a)(6) to exclude a wide array of everyday situations in which an act is intentional, but the resulting injury is unintended. *Id.* In *Kawaauhau*, the Supreme Court indicated that willfulness is properly interpreted as "actual intent to cause injury". *Kawaauhau*, 523 U.S. at 61. However, the Supreme Court has not clearly defined the scope of the requisite intent needed to establish willful conduct (*e.g.,* the debtor's subjective intent to injure the creditor versus the debtor's subjective knowledge that his acts were substantially certain to cause injury). *Conseco*, 261 B.R. at 520; *see also In re Cox*, 243 B.R. 713, 718 (Bankr. N.D. Ill. 2000). Courts in the Eleventh Circuit have held that "substantial certainty of injury alone is *not* sufficient to satisfy § 523(a)(6) willfulness under *Kawaauhau*. *See In re Tomlinson*, 220 B.R. 134, 137-38 (Bankr. M.D. Fla. 1998) (the "Eleventh Circuit's substantially certain standard may be inconsistent with Kawaauhau and applying a strict 'intent to cause injury' standard.").

68. Here, Meir's actions are sufficient to deem Meir's debt to YH nondischargeable under either standard applied to 11 U.S.C. § 523(a)(6). From the inception of Meir's dealings with YH, when YH extended the HFZ Loans and Meir held himself out to YH as a person who had a

21

membership or ownership interest in HFZ, which he did not, among other misrepresentations, Meir acted with the actual intent to harm YH as well as with substantial certainty that YH would be harmed by Meir's actions. *See Complaint* at ¶ 44. While at HFZ, Meir engineered a scheme to divert millions of dollars of investor monies, including specifically YHs' funds, which were intended for HFZ's real estate projects, from HFZ to himself personally. *id.* at ¶¶ 4, 8-9. This scheme has resulted in hundreds of millions of dollars of damages to investors, including the theft of YH's funds (for Meir's shameless personal enjoyment). *id.* at ¶ 6.

69.     Meir's outrageous and intentional conduct in deliberate furtherance of his fraud schemes evidences a high degree of moral turpitude, wanton dishonesty and a complete indifference to his civil obligations, which intent and harm were specifically directed at YH and resulted in millions of dollars in damages to YH. *id.* at ¶¶ 6, 13-14, 17, 20, 25-26, 32, 53.

70.     Contrary to Meir's argument, the allegations set forth in the Complaint specifically detail conduct that is far more than a "financial or contractual dispute." *See* Meir Motion to Dismiss at p. 3. At every turn, Meir's actions towards YH were intentional, willful, malicious and unconscionable and resulted in substantial injury to YH. *id.* at ¶¶ 13-14. Consequently, Meir's debt to YH should be excepted from discharge.

### III.   DEFENDANT'S MISCELLANEOUS GROUNDS TO DISMISS MUST BE DENIED

71.     In his Motion to Dismiss, Meir asserts three additional grounds for dismissal of the Plaintiff's Complaint, including (D) Failure to Plausibly Allege Damages; (E) Plaintiff's Conduct Undermines its Claims; and (F) Alternative Request for More Definite Statement. *See Motion to Dismiss* at pp. 3-4.

72.     Defendant's arguments (presumably AI generated) in Sections D, E and F of his Motion to Dismiss lack relevancy and are so confusing that it makes it difficult to discern

22

35985739-1

Defendant's point at all. Consequently, Defendant's objections should be rejected. Meir's confusing contentions should be dismissed on substantive grounds as well.

73.    First, Defendant's assertion that the Plaintiff has not shown the "existence of loss" is devoid of merit. In fact, the Plaintiff's Complaint contains numerous allegations of the harm caused by Meir and YH's resulting loss and damages caused by Meir's actions. *See* Complaint at ¶¶ 6, 13-14, 20, 25-26, 32, 53. Defendant further speculates (wrongly) that Plaintiff has satisfied or partially satisfied its judgments with respect to the monies that Meir squandered and fraudulently conveyed. *id.* at 26. He further speculates as to the amounts Plaintiff has recovered in connection with those settlement agreements.

74.    Notably, the parties to this action have not yet commenced discovery and, where responsive, relevant and not subject to confidentiality provisions, Plaintiff will disclose the remaining amount of the damages it has not recovered from other sources (in fact, amounting to the entirety of the Meir Judgment). Discovery will clearly show that Meir's contention is baseless and dismissal of the Complaint on these grounds would be without merit.

75.    Defendant further alleges that Plaintiff's conduct undermines its claims; however, the Defendant fails to specify the conduct and fails to understand how extensions of time to commence claims are connected to the mootness of the claims set forth in the Complaint as Defendant unsuccessfully asserts.

76.    Finally, Defendant's assertion that the Complaint is "too vague to permit a response" should be summarily rejected. As set forth in the Complaint, and herein, the Complaint is hardly threadbare – containing 161 enumerated allegations of Defendant's unconscionable conduct all or which justifies the denial of the discharge of the YH Claim against the Defendant.

35985739-1

**CONCLUSION**

77.    YH has standing to assert the claims set forth in the Complaint. The factual allegations and claims set forth in YH's Complaint satisfy the pleading requirements of Section 523(a)(2), (4) and (6).  Accordingly, YH respectfully requests that the Court deny Meir's Motion to Dismiss in its entirety.

78.    YH respectfully requests that the Court deny Meir's Motion to Dismiss in its entirety.

Dated:  June 17, 2026

BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel: (305) 755-9500
Fax: (305) 714-4340

By:  */s/ Jordi Guso*
     Jordi Guso
     Florida Bar No. 863580
     jguso@bergersingerman.com

-and-

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Tracy L. Klestadt, *Admitted Pro Hac Vice*
tklestadt@klestadt.com
Kathleen M. Aiello, *Admitted Pro Hac Vice*
kaiello@klestadt.com

*Co-Counsel for YH Lex Estates, LLC*

24

35985739-1

25

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic mail and Regular U.S. Mail, postage prepaid upon **Mr. Nir Meir, 102 24th Street, Unit 1204, Miami Beach, FL 33140, Email: nir@eammcap.com** on June 17, 2026.

By:   */s/ Jordi Guso*
       Jordi Guso

35985739-1